(Hull of the sixth circuit sitting in place of Marvin.)

YOUGHIOGHENY & OHIO COAL CO. v. ERIE RY. CO., ERIE COAL TRANSFER CO. AND PITTSBURGH COAL CO.

COALING MACHINE PART OF TERMINAL FACILITIES OF RAILWAY.

A machine for unloading coal from cars into boats, situated upon the docks of a railway company at its lake terminal, owned, constructed, and maintained jointly by such company and a coal transfer company, and operated by such coal transfer company for the accommodation of the patrons of the railway company under the direction of the railway company and at prices fixed by it, is devoted to a public use and is part of the terminal facilities of such railway, and a grant to one shipper of coal of the exclusive use of such machine is an unlawful discrimination, which will be enjoined, notwithstanding a conveyance by the railway company to the transfer company of all its rights in such machine.

APPEAL by defendant, The Erie Ry. Co.

Hoyt, Dustin & Kelly, for plaintiff.

Williamson, Cushing & Clark, for Erie Ry. Co.; Wilcox, Collister, Hogan & Parmely and Goulder, Holding & Masten, for Pittsburgh Coal Co. and Erie Coal Transfer Co.

HALE, J.

The plaintiff brought its action to prevent what it alleges to be a discrimination against it by the defendant, The Erie Railroad Company,

in the handling of freight at Cleveland. This discrimination is alleged to result by depriving it of the use of certain machinery for the rapid transfer of coal from cars to boats which is granted by the railroad company to the defendant, The Pittsburgh Coal Company.

It is made manifest by the evidence, that the use of such machinery is indispensable to the successful prosecution of the business in which both of these companies are engaged.

The case of the Rhodes & Beidler Company v. Erie Railroad Company et al. (not reported), decided by this court at a former term, involved facts and issues in some respects identical with, and, in other respects, very similar to, those to be considered in the determination of this case. Because of the criticism made on our decision in that case, and the further fact that the court is now differently constituted, we have carefully considered all the facts bearing upon *this* case and the law therein announced.

The defendant, The Erie Railroad Company, is a common carrier of freight and passengers, and, as such, hauls large quantites of coal from the mines in Pennsylvania to Cleveland, designed for transshipment there to vessels for carriage to the upper lakes. Coal transferred over its road by the railroad company for this purpose, constitutes a distinct class of freight, for which a special or distinct rate is fixed by the company. This railroad company owns a large dock frontage on the Cuyahoga river, with which its tracks do, and for many years have, connected. A dock, owned by the railroad company with which its tracks thus connect, has, for a number of years, been used mainly, if not solely, for the transfer of coal from cars to vessels or for loading coal on boats. The methods of doing this have been of various kinds and improved from time to time.

In 1895 several shippers of coal over this road caused to be incorporated the defendant, The Erie Coal Transfer Company. The business of this corporation was the unloading of coal from cars to vessels, which, up to this time, had been principally done by each individual shipper in his own way, but upon the docks provided by the railroad company. It was, undoubtedly, in contemplation of all parties to that arrangement, including the railroad company, that better facilities should be provided for that work. In furtherance of such purpose, the railroad company and transfer company, on March 9, 1895, entered into a written agreement as follows:

"This memorandum of agreement entered into this ninth day of March, 1895, between the New York, Lake Erie & Western Railroad Company, and John King and John McCullough, as receiver of the property of said company, and the successors and assigns of each of

them, party of the first part, and the Erie Coal Transfer Company (hereinafter called the transfer company), party of the second part, witnesseth: The party of the first part is to furnish, at his own expense, and maintain certain tracks and dock facilities on the Cuyahoga river, at Cleveland, Ohio, as shown on the attached plans, to be used for the transfer from cars to vessels of coal shipped over its lines. The transfer company agrees to provide, maintain and operate at its own cost and at its own risk, a machine for the dumping of coal from cars, via chutes into vessels. In so maintaining it second party shall keep it in good repair and condition so that in case of any purchase by the first party of the machine, or of stock of the transfer company, as hereinafter provided, the machine shall be at the time of such purchase, as good as new, depreciating from ordinary use, wear and tear, that cannot be made good by such repairs as a prudent owner would naturally make, alone excepted. The plans for the said machine are to be submitted to and approved by the chief engineer of the said receivers, and the transfer company is to have the right to enter upon and use so much of the first party's property as may be necessary for the erection, maintenance and operation of said machine, as shown on plan hereto attached. The transfer company is to influence as far as possible the shipments of coal over the line of first party, for handling at its plant, and is to charge parties for coal handled at the plant, a price for said handling which shall be fixed from time to time by first party's general freight agent at Cleveland, which price, however, shall in no event be less than the minimum charge for similar services at Cleveland, Ashtabula, Fairport, Conneaut and Erie, nor less than the costs to the second party handling the same, in such cost of handling to be taken into consideration the expense of keeping the machine in good repair and condition, and a five per cent. annual profit on the costs of the machine.

"Should the chief engineer of the first party within the first sixty days of operation of the machine, after its erection, decide the machine to be a failure for the purposes for which it is intended, this contract shall terminate on notice from first party, and thereupon second party shall remove the machine, and the net loss to second party on the cost of the machine shall be borne, half by the second party and half by the first party, first party paying second party half of such net loss. Second party agrees to use its best endeavors to keep the plant in operation up to its full capacity during the whole of each season, and if second party shall fail, and after five days' notice from first party continue to fail to comply with such agreements, first party may require second party to handle at the plant such coal as first party may tender, or cause to be tendered, at a price fixed by said general freight agent, such price,

however, not to be lower than the minimum price for like service, at the time being, at the ports above mentioned. Should second party fail for ten days thereafter to handle such coal at such price, then first party may terminate this contract upon five days' notice to second party, and thereupon second party shall be required to remove its machine and withdraw from the premises. First party shall have the privilege, during the month of January in any year during the continu· ance of this contract, of purchasing from second party the transferring machine herein provided for, or of purchasing from any stockholder of second party all or any of his stock upon giving at any time, during said month of January, thirty days' notice of its desire so to do, at a price equal to the cost price of such machine as the stock purchased shall be of the total stock of the second party, less the depreciation on such cost price from the ordinary wear and tear of such machine, not to be made good by the repairs that second party is to make, which depreciation is hereby fixed for the purpose of this provision at five per cent. per annum; and first party agrees at the election of second party to purchase the machine, or at the election of any stockholder of second party to purchase his stock at a price measured by the cost price of the machine, less depreciation in the manner above described; provided, thirty days' notice of such election of second party or of its stockholders shall be given first party in the month of January in any year during the continuance of this contract. In case, however, any such stockholder shall call on first party to buy his stock in such manner, first party may buy all, or any proportion of the rest of the stock of the transfer company at a price computed in the manner aforesaid, by giving notice of his desire so to do, within thirty days thereafter."

The parties to this agreement immediately entered upon its fulfilment. It cannot be denied that the plant which was to be, and was, constructed under this contract, was intended to be used by *all* shippers of coal brought to Cleveland by the Erie Railroad Company for shipment by boat to the upper lakes. The railroad company not only furnished a large proportion of the expense for the construction of this plant, considered as a whole, but retained absolute control over the conduct of the business thus provided for. The railroad company built the trestle, tracks and foundations, and furnished the dock as therein agreed. The transfer company erected the machine, but, before that was done, plans were to be and undoubtedly, were, submitted to and approved by the railroad company. Indeed, the railroad company, in fact, constructed the machine, but not at its own expense. The transfer company stipulated to influence as far as possible, the shipment of coal over the Erie railroad to be handled at this plant at a price to be fixed by the railroad

company. Manifestly such influence was to extend to any and all shippers of this class of freight, and the use of this plant was to be extended to all without discrimination.

The transfer company also agreed with the railroad company to use its best endeavors to keep the plant in operation up to its full capacity during the whole of each season. It is plain that this agreement with the transfer company was exacted by the railroad company for the accommodation of shippers of coal over its road and that *all* might be served alike. There are other stipulations of the contract of like import.

Under these facts, it seems plain that the occupation of this dock, the use of this machine, the tracks and trestles leading to both—the plant as a whole, was only a means employed by the railroad company in the process of its legitimate business as a common carrier.

To induce the shipment of coal over its track, designed for transshipment at Cleveland from cars to boats, it was entirely proper that the railroad company should furnish means for such transshipment. This contract provided proper and effective means for that purpose. Moreover, it was the means designed by both parties to be open to all shippers of that class of freight wthout discrimination; and it seems clear that while this arrangement remained in force, the whole plant, the tracks, the trestles and foundation, which the railroad company was bound to furnish, and the machine to be used and operated by the transfer company under the restrictions and conditions named in said contract were intended to be, and were, in fact, devoted to a public use, and that, in this way, this plant became inseparably connected with, and was, in fact, a part of the property of the railroad company, used by it in the performance of its duty as a common carrier.

The business continued under this contract and in the manner therein contemplated, until December, 1899. A change in the size of the cars used in the carriage of this class of freight necessitated a change in the plant. The defendant, The Pittsburgh Coal Company, was, at this time, a large shipper of coal over the Erie railroad for trans-shipment at Cleveland and interested in bringing about these changes.

After some negotiations, on December 15, 1899, the Pittsburgh Coal Company and the Erie Railroad Company settled the preliminary steps to be taken in effectuating such change, as shown by the following memoranda:

"Memorandum of understanding between Mr. Osborne of the Pittsburgh Coal Company and Messrs. Cochran, Buchholtz, Moorhead and Middleton representing the Erie Railroad Company of Cleveland, December 15, 1899.

"The cost of the new car-unloader to be erected at Cleveland is estimated at forty thousand dollars ($40,000). The cost of transferring the present loader to a new site is estimated at twenty thousand dollars ($20,000). Total new capital required is estimated sixty thousand dollars ($60,000). The Erie Coal Transfer Company is to increase its capital stock sixty thousand dollars ($60,000) or whatever amount may be sufficient to cover the above expenses. Of the increased new capital stock, the Pittsburgh Coal Company is to purchase at par fifty per centum (50 per cent.). The increased capital stock is to be handled and placed in trust in the same manner as the present capital stock of the Erie Coal Transfer Company; the Erie Railroad Company to have the same option in regard to purchase as exists in the present contract between the Erie Railroad Company and its predecessors and the Erie Coal Transfer Company."

On the construction of the new fast unloader, it was proposed to supersede the original contract between the Erie Railroad Company and the Erie Transfer Company by a new contract. A copy of that agreement as proposed by the railroad company, was given in evidence. That agreement was never signed. The design, however, of this proposed arrangement was not different from that originally made between the railroad company and the transfer company. The understanding of the railroad company of the situation as it existed after the changes contemplated were made, appears not only from this proposed contract, but from statements made by the officials of the road, by telegrams and letters sent to the plaintiff company. Clearly the railroad company designed to furnish a mode for the transfer of this class of freight at Cleveland from cars to boats, which should be available to all shippers of that class of freight over its road; and such was the understanding of the railroad company down to April 16, 1902. The old machine, known as No. 2, was moved and the new No. 1 constructed as contemplated. The cost was proportioned one-half to the railroad company and one-half to the Pittsburgh Coal Company. The tracks, trestles, etc., were adapted to the use of both machines by the railroad company, and the plant, as reconstructed, under this arrangement, has continued in use to the present time. From its completion in the spring of 1900, the Pittsburgh Coal Company was, perhaps, the only shipper of this class of freight to Cleveland over the Erie road and the only user of this plant down to April, 1902. In April of that year, the plaintiff company began the shipment of coal over its road, demanding that its coal be handled over this plant. This request of the plaintiff was refused after considerable negotiations, for two reasons :

First. That the machine No. 1, constructed as we have seen, was

the private property of the Pittsburgh Coal Company, used for its own private purposes, and, whether owned by the coal company, or by the coal company and the railroad company jointly, it had never been devoted to a public use, so as to be subject to the control of the courts.

Second. That if it ever was so devoted to a public use, it was by a sale and transfer made April 16, 1902, by the railroad company, of all its interest to the Pittsburgh Coal Company, withdrawn from such use.

The first of these claims has already been considered to some extent, so far at least as it related to machine No. 2, and the conclusion reached that it *had* been devoted to such public use.

The relation of the railroad company to this plant as reconstructed, and this new machine, independent of the alleged sale of April 16, 1902, is in no sense different from its relation to the plant before such reconstruction. It will not be denied that a railroad company may furnish terminal facilities, depots, etc., for the proper conduct of its business as a common carrier, to which *all* shippers are entitled to equal privileges. The means of handling freight at depots should be, and is, available to all. The coal handled over this dock and this fast unloader belongs to a distinct class of freight, for the handling of which other means than yards and depots are required. This has been recognized by the railroad company, and proper terminals and facilities for handling have been provided. The facts do not warrant the assumption that the business of receiving this class of freight and transferring it from cars to boats is disconnected with the business of the railroad company as a common carrier. It was recognized and made a part of such business by the railroad company. This entire plant, down to April 16, 1902, was devoted to a public use. The fact that the machine, which was only a part of the entire plant, which could not be operated independent of the railroad and the use of its property was owned, in whole or in part, by the transfer company or the Pittsburgh Coal Company, does not vary this fact. The operation of taking loaded cars from the yard of the railroad company and dumping their contents into the vessels was, in part, done by the railroad company, which owned at least a large proportion of the property used in this operation, and the whole was an agency employed by the railroad company for that purpose.

As to the second claim of the defendants, it is not disputed that the railroad company might not, acting in good faith, withdraw this service from all shippers; deliver the coal only in its yards, leaving each to provide its own means of making the transfer, but this has not been done. Instead of enforcing the position taken by the railroad company, in its letters, it claims to have sold its entire interest in the fast unloader to the Pittsburgh Coal Company and leased to that company so much of

its docks as is necessary for the prosecution of the business connected therewith, thereby putting out of its power to comply with the request of the plaintiff.

This alleged sale rests entirely in parol; no written evidence of the sale or receipt of the money is produced. A lease from the railroad company to the Pittsburgh Coal Company, of the proposed privileges upon this dock, was drawn, but has not, to the present time, been executed. There has been no change in the mode of doing business. The railroad company still owns the dock, trestles, tracks and foundations of the machine. It continues to deliver cars at the machine and remove them when unloaded, as heretofore. It is conclusive that this sale and lease, pretended or otherwise, was intended to aid in excluding the plaintiff from the use of this plant, and securing to the Pittsburgh Coal Company' the exclusive use of the same. This, we believe, was the sole purpose of this arrangement, and that the agreement went only so far as it was thought necessary to accomplish that one object. We seriously doubt whether it was intended that that lease-should be executed, or that it ever will be. It will have accomplished its full purpose if the plaintiff is excluded from the use of that machine.

We cannot hold from this evidence that this plant, by the transaction of April 16, was withdrawn from public use to which it had been for several years devoted by the railroad company. The dock, the trestles, tracks, and foundations of this plant are terminal facilities of the railroad company, the exclusive use of which it could not rightfully grant to one shipper of coal and refuse to another without an unlawful discrimination. The fact that only part of this plant which, prior to April 16, was owned jointly by the Pittsburgh Company and the Erie Railroad Company, but is now owned wholly by the former company, if such be the fact, cannot change the rights of the patrons of the Erie Railroad Company, and so long as that company maintains this plant for this purpose in the manner here indicated and handles the cars thereon for the benefit of one shipper, it must for all.

The true intent and meaning of the arrangements between the railroad company, the Pittsburgh Coal Company and the transfer company was to provide by the railroad company a means for the transfer of coal from cars to boats for the accommodation of its patrons. The control of the means thus provided, by whomsoever owned, has, at all times, been in the substantial control of the railroad company and without its co-operation could not be operated. Any private ownership of the fast unloaders has at all times been and now is under such arrangements, subject to such control by the railroad company. This results from the nature of the transaction, the uses to which the fast unloaders were devoted in

connection with the property of the railroad company, the service performed by the railroad company in making the transfer, and the proper construction and interpretation to be given to the contracts between the owners or part-owners of the fast unloader machine and the railroad company.

But it is said that the railroad company has performed its full duty toward the plaintiff by tendering to it a dock and location for a like plant further up the river. This claim is made from allegations sustained in the answer. We do not understand that the railroad company has, in any binding way, offered or agreed to fit up a plant for the use of the plaintiff, of equal cost, convenience and efficiency as the one now used by the Pittsburgh Coal Company. The means now provided by the railroad company for the handling of this class of freight is ample to accommodate all shippers, over its road, of coal designed for the upper lakes; and we do not think that the railroad company has relieved itself from the charge of discrimination as between shippers by the offer made.

We have examined the many cases cited by counsel; but, if the conclusions reached by us on the facts are to stand, there can be no disagreement as to the law applicable to those facts, and hence, we have not deemed it necessary to enter upon a review of the authorities cited.

Judgment for plaintiff.

---

# FRAUDULENT CONVEYANCE.

[Jefferson (7th) Circuit Court, November Term, 1902.]

Burrows, Laubie and Cook, JJ.

## JOHN J. PARKINSON ET AL. V. ASENATH PARKINSON ET AL.

FRAUDULENT CONVEYANCE—EJECTMENT—CANCELLATION OF DEED.

Where a deed of conveyance of real estate is made and delivered for the purpose of hindering, delaying and defeating a creditor, as both grantor and grantee well knew, in the collection of a claim upon which an action had been brought; and after the execution of the deed the action is compromised and settled by the grantor with the knowledge and consent of the grantee; and after such settlement the grantor and grantee enter into a verbal agreement that they will cancel the contract of sale and reinvest the grantor with the title to the land by the grantor delivering up the notes executed for the consideration named in the deed and the grantee delivering up the deed which had not been recorded, both notes and deed to be destroyed; and the grantor duly delivers up the notes to the grantee, which are by him destroyed; and the grantee makes diligent effort to obtain the deed for the purpose of delivering it to the grantor to be destroyed, but is prevented from obtaining it by the act of one of his children who secretly abstracted the same from his father's papers; and both grantor and grantee lived many years after-